Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | P. Michael Mahoney | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 02 C 50320 | **DATE** | 7/23/2003 |
| **CASE TITLE** | Dahlmeier vs. Barnhart | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m)  ☐ General Rule 21  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] For the reasons stated on the attached Memorandum Opinion and Order, Plaintiff's Motion for Summary Judgment is granted. The case is remanded for clarification of Plaintiff's job availability and consideration of Plaintiff's ability to perform that type of work. It is further ordered that Defendant's Motion for Summary Judgment is denied.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | Document Number |
|---|---|---|---|---|
| | No notices required. | | number of notices | |
| ✓ | Notices mailed by judge's staff. | | | 13 |
| | Notified counsel by telephone. | | JUL 24 2003 date docketed | |
| | Docketing to mail notices. | | | |
| | Mail AO 450 form. | U.S. DISTRICT COURT CLERK | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | 7/23/2003 | |
| sp | courtroom deputy's initials | 03 JUL 23 PM 4:03 | date mailed notice sp | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| | |
|---|---|
| KEN L. DAHLMEIER,<br><br>Plaintiff,<br><br>v.<br><br>JO ANNE B. BARNHART,<br>COMMISSIONER OF SOCIAL<br>SECURITY,<br><br>Defendant. | Case No. 02 C 50320<br><br>Magistrate Judge<br>P. Michael Mahoney |

## MEMORANDUM OPINION AND ORDER

Ken L. Dahlmeier, ("Plaintiff"), seeks judicial review of the final decision of the Commissioner of the Social Security Administration ("Commissioner"). *See* 42 U.S.C. §§ 405(g), 1383(c)(3). The Commissioner's final decision denied Plaintiff's application for Disability Insurance Benefits ("DIB") pursuant to Title XVI of the Social Security Act (the "Act"). 42 U.S.C. §1381(a). This matter is before the Magistrate Judge pursuant to consents filed by both parties on December 10, 2002. *See* 28 U.S.C. § 636(c); Fed. R. Civ. P. 73.

## I. BACKGROUND

Plaintiff filed for DIB on February 17, 2000, alleging disability beginning June 21, 1998. (Tr. 79). Plaintiff's application for benefits was denied on March 31, 2000. (Tr. 81). On April 18, 2000, Plaintiff filed a request for reconsideration. (Tr. 85). Plaintiff's request for reconsideration was denied on May 9, 2000. (Tr. 87). Plaintiff then filed a request for a hearing before an Administrative Law Judge ("ALJ") on June 16, 2000. (Tr. 90). Plaintiff appeared, with counsel, before an ALJ on November 16, 2000. (Tr. 22-78). In a decision dated December 22, 2000, the ALJ found that Plaintiff was not entitled to DIB. (Tr. 13-21). On January 2, 2001, Plaintiff requested a

review of the ALJ's decision by the Appeals Council. (Tr. 8). On July 12, 2002, the Appeals Council denied Plaintiff's request for review. (Tr. 5).

## II. FACTS

Plaintiff was born on November 24, 1946 and was fifty-three years old at the time of his November 2000 hearing. (Tr. 27). Plaintiff obtained his General Equivalency Diploma ("GED") in 1980 and has past relevant work experience as an equipment operator, truck driver, and engineering assistant. (Tr. 138, 151). Plaintiff was married with no children at home at the time of the November 2000 hearing. (Tr. 28).

On June 21, 1998, Plaintiff fell eight feet off of a roof and injured his right knee. (Tr. 178). He was taken to the operating room at the Swedish American Hospital in Rockford, IL to undergo a surgical operation for a displaced tibial plateau fracture. (*Id.*). Three days later, following physical therapy, he was discharged from the hospital. (Tr. 177). At that time, there was no indication of injury to any other part of Plaintiff's body. (*Id.*).

At the November 2000 hearing, Plaintiff testified that for four months immediately following his injury, he was unable to put any weight on his leg. (Tr. 51). For the following three months, he moved with the aid of a wheelchair and crutches. (Tr. 52). By January of 1999, Plaintiff was able to move with the help of a cane, prescribed by Dr. Nyquist. (Tr. 54, 55).

From 1995 until the accident, Plaintiff worked as an equipment operator. (Tr. 33). During that time, he was responsible for operating end loaders and top grinders at a compost site where yard waste is ground and hauled into fields. (Tr. 35). Plaintiff was also responsible for occasionally lifting forty pound bags and shoveling material under the conveyors. (Tr. 36). This position required Plaintiff to stand or walk for about two hours throughout a given day. (Tr. 39).

In December of 1998, after his injury, Plaintiff returned to his former employment as an equipment operator. (Tr. 34). Although the plant was closed over the holidays, he worked at this job from January 1999 to March 1999. (*Id.*). In March 1999, Plaintiff underwent a surgical operation on his right great toe, but returned to work again in April 1999. (*Id.*) Plaintiff worked until September 13, 1999 at which point he testified that he could no longer perform this job because of pain to his knee and foot. (Tr. 33). Plaintiff's last attempt to do any kind of work was in January of 2000. (Tr. 31). As a result of working for one week as a helper on a delivery truck, Plaintiff reported increasing pain in both of his knees and ceased working. (Tr. 158).

During the November 2000 hearing, Plaintiff testified that he could no longer do his previous work as an equipment operator because he could not do the standard work activities. Specifically, he was having trouble climbing in and out of the loader. (Tr. 40). Plaintiff testified that due to the pain in both of his knees, he was no longer able to grease the machines, crawl under the equipment when necessary, or lift the amount of weight that he could previously. (Tr. 36, 40).

In March 1999, Plaintiff underwent surgery on his right great toe. (Tr. 193). The following year, on January 7, 2000, Plaintiff underwent repeat surgery on his big right toe to relieve him of stiffness and pain. (Tr. 199). A month later, Dr. Nyquist expressed his opinion that it would be wise for Plaintiff to find a sit-down type of job. (Tr. 213).

On April 6, 2000, Dr. Nyquist composed a letter addressed "To Whom It May Concern" affirming that Plaintiff was left with a significant disability. (Tr. 227). In this letter, Dr. Nyquist reported that although surgery had helped both of Plaintiff's injuries, Plaintiff's range of motion was limited and he would require future surgery at some point. (*Id.*). Specifically, Dr. Nyquist indicated that Plaintiff could no longer maintain a stand-up position at work. (*Id.*).

3

At the November 2000 hearing, Plaintiff testified that both of his knees ache constantly, and that his pain worsens the more he stands. (Tr. 25). He testified to continuing with physical therapy for his injuries both at home and at a health club. (Tr. 29). His exercise routine consisted in bicycling twice a day for fifteen minutes each time. (*Id.*). Plaintiff also testified to doing some of the housekeeping, such as vacuuming. (Tr. 24). However, he testified to not being able to grocery shop because of his inability to walk for an extended period of time. (*Id.*). Plaintiff testified to only being able to drive for less than an hour at a time due to his inability to sit in one position for an extended period of time. (Tr. 74). Plaintiff also testified to using his cane anytime that he was going to be on his feet for an extended period of time, though he never used his cane in the workplace. (Tr. 53, 54).

Vocational expert, Christopher Yep, appeared before the ALJ at Plaintiff's November 2000 hearing. (Tr. 59). The ALJ directed Mr. Yep to assume an individual of Plaintiff's age and education, with similar work history, who could "lift and carry up to a maximum of 20 pounds on an occasional basis, and 10 pounds frequently. Sit, stand and walk with normal breaks for up to six hours in an eight-hour day. Individual may climb, balance, kneel stoop, crouch and crawl no more then occasional basis." (Tr. 64). Based on the hypothetical, Mr. Yep stated that such a person could still perform the work as an engineering assistant, but could not perform as a delivery driver or as an equipment operator. (Tr. 61, 65). When asked to modify the hypothetical to assume a person who could "stand and walk for up to a combined total of six hours in an eight hour day, but not longer then...two hours continuously without being able to sit down for two or three minutes," Mr Yep stated that such a person could still perform as an engineering assistant. (Tr. 65). When asked by the ALJ about an individual who could not stand for a total of two hours in an eight hour day, for

4

no longer then fifteen to twenty minutes continuously, Mr. Yep stated that such a person could not perform the work of an engineering assistant. (Tr. 66).

The ALJ also asked Mr. Yep whether any skills from the hypothetical person's previous jobs would be transferable to other work within the region. (Tr.66). Mr. Yep stated that the person would still be able to do other types of equipment operation at a lighter level. (Tr. 67). Mr. Yep stated that the "actual operation of the equipment" would be transferable, and that the particular type of work would "fall under the range of equipment operators." (*Id.*). He stipulated that the person would be able to operate the equipment "but not having to get off and...do the shoveling or carrying of bags or that type of thing." (*Id.*). Mr. Yep found that Plaintiff's skills of equipment operation and familiarity were transferable to 6,852 equipment operator jobs at a light level of exertion existing in the regional economy. (Tr. 71). While the jobs are primarily sitting, he classified them as light due to the need to operate foot pedals. (Tr. 69).

When asked by the ALJ whether the occasional use of a cane for purposes of ambulation would of itself impact a person's ability to do work, Mr. Yep indicated that it would not. (Tr. 68). He stated that the use of a cane does not necessarily indicate that a person cannot ambulate, but it implies a weakness or a problem in the leg. (Tr. 68, 71). Mr. Yep indicated that in order to operate the equipment, the person would have to operate foot pedals. (Tr. 71). When asked by the ALJ whether the use of a cane would eliminate the capacity to perform the job as equipment operator at a light level, Mr. Yep stated that it would. (*Id.*).

## **MEDICAL HISTORY**

The earliest medical record available to the Magistrate Judge is dated June 21, 1998. (Tr. 176). On this date, Plaintiff was admitted to the operating room at the Swedish American Hospital

5

due to a displaced right tibial plateau fracture resulting from a fall off of a roof. (Tr. 180). Plaintiff was treated by attending physician, Dr. Nyquist, and underwent open reduction internal fixation on the right tibial plateau. (*Id.*). The physical examination revealed pain and swelling in Plaintiff's right knee following the operation. (*Id.*). Plaintiff was discharged on crutches from the hospital three days later with instruction to keep the brace on his leg and to keep his leg elevated. (Tr. 177). Plaintiff was given a prescription for Vicodin. (*Id.*). Following the operation, Plaintiff's family physician, Dr. Kobler, took Plaintiff off of Vicodin, due to stomach problems, and prescribed Ultram for him. (Tr. 204).

Plaintiff saw Dr. Nyquist again on July 6, 1998. (Tr. 205). Dr. Nyquist indicated that the surgical wound looked fine and that there were no infections. (*Id.*). Dr. Nyquist advised Plaintiff to continue on crutches and to perform leg exercises, including straight let raises and ankle pumps. (*Id.*). Two weeks later, Plaintiff's leg was placed in a brace. (Tr. 206).

In several follow-up examinations, Dr. Nyquist continually reported that Plaintiff's knee bending capability was improving. (Tr. 206). On September 8, 1998, Dr. Nyquist sent Plaintiff to physical therapy to improve the motion in his leg and the following month Dr. Nyquist prescribed a cane for Plaintiff. (Tr. 207, 208). In December of 1998, Plaintiff began reporting significant pain and discomfort in his right first metatarsophalangeal joint and X-rays revealed that some arthritic changes had occurred in this joint. (Tr. 209). At that time, he did not require medication, but was periodically walking with cane. (*Id.*).

In December 1998, Dr. Nyquist again examined Plaintiff's right great toe due to considerable stiffness in the joint. (Tr. 210). This evaluation revealed that Plaintiff had arthritis in this joint for which he received a cortisone injection, and later a prescription for Oruvail. (*Id.*). The injection

produced no significant results and on March 23, 1999, Plaintiff underwent a surgical exploration and debridement of the metacarpophalangeal joint in his right great toe. (Tr. 192). A month later, Plaintiff was no longer taking his medication and Dr. Nyquist reported that Plaintiff's condition was improving. (Tr. 211). Dr. Nyquist then gave Plaintiff a work slip so that he could return to work on the following Monday. (*Id.*).

On January 7, 2000, Plaintiff was again treated by Dr. Nyquist at Swedish American Hospital following chronic pain and stiffness in his right great toe. (Tr. 199). Plaintiff complained of decreased motion and lack of extension in his toe. (Tr. 201). Dr. Nyquist recommended and proceeded to perform a second surgical operation on the joint, specifically another debridement and resection in the right first toe metatarsopharyngeal joint. (Tr. 202). The following month, Plaintiff returned to Dr. Nyquist because Plaintiff had slipped on some ice and again injured his right knee. (Tr. 213). Dr. Nyquist then opined it would be wise for Plaintiff to get a sit-down type job. (*Id.*).

In a letter addressed "To Whom It May Concern," dated April 5, 2000, Dr. Nyquist wrote that Plaintiff was left with a significant disability following the operations on his knee and toe. (Tr. 227). Dr. Nyquist stated that Plaintiff had restricted range of motion in his knee and foot, and definite restriction to kneel, squat, climb, and prolonged time on his feet. (*Id.*). Dr. Nyquist further represented that Plaintiff is no longer able to work in a stand-up position and that future surgery particularly to his knee, will be required. (*Id.*).

## IV. STANDARD OF REVIEW

The court may affirm, modify, or reverse the ALJ's decision outright, or remand the proceeding for rehearing or hearing of additional evidence. 42 U.S.C. § 405(g). Review by the court, however is not *de novo*; the court "may not decide the facts anew, reweigh the evidence or

substitute its own judgment for that of the ALJ." *Meredith v. Bowen*, 833 F.2d 650, 653 (7th Cir. 1987) (citation omitted); *see also Delgado v. Bowen*, 782 F.2d 79, 82 (7th Cir. 1986). The duties to weigh the evidence, resolve material conflicts, make independent findings of fact, and decide the case accordingly are entrusted to the commissioner; "[w]here conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the Commissioner (or the Commissioner's delegate the ALJ)." *Richardson v. Perales*, 402 U.S. 389, 399-400 (1971), *Walker v. Bowen*, 834 F.2d 635, 640 (7th Cir. 1987). If the Commissioner's decision is supported by substantial evidence, it is conclusive and this court must affirm. 42 U.S.C. § 405(g); *see also Arbogast v. Bowen*, 860 F.2d 1400, 1403 (7th Cir. 1988). "Substantial evidence" is "such relevant evidence as a reasonable person might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401.

The Seventh Circuit demands even greater deference to the ALJ's evidentiary determinations. So long as the ALJ "minimally articulate[s] his reasons for crediting or rejecting evidence of disability," the determination must stand on review. *Scivally v. Sullivan*, 966 F.2d 1070, 1076 (7th Cir. 1992). Minimal articulation means that an ALJ must provide an opinion that enables a reviewing court to trace the path of his reasoning. *Walker v. Bowen*, 834 F.2d 635, 643 (7th Cir. 1987), *Stephens v. Heckler*, 766 F.2d 284, 287 (7th Cir. 1985). Where a witness credibility determination is based upon the ALJ's subjective observation of the witness, the determination may only be disturbed if it is "patently wrong" or if it finds no support in the record. *Kelley v. Sullivan*, 890 F.2d 961, 965 (7th Cir. 1989), *Stuckey v. Sullivan*, 881 F.2d 506, 509 (7th Cir. 1989). "However, when such determinations rest on objective factors of fundamental implausibilities rather than subjective considerations, [reviewing] courts have greater freedom to review the ALJ decision."

*Herron v. Shalala*, 19 F.3d 329, 335 (7th Cir. 1994), *Yousif v. Chater*, 901 F. Supp. 1377, 1384 (N.D. Ill. 1995).

## V. **FRAMEWORK FOR DECISION**

The ALJ concluded that Plaintiff did not meet the Act's definition of "disabled," and accordingly denied his application for benefits. "Disabled" is defined as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382(c)(3)(A). A physical or mental impairment is one "that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 1382(c)(3)(C). *See Clark v. Sullivan*, 891 F.2d 175, 177 (7th Cir. 1988).

The Commissioner proceeds through as many as five steps in determining whether a claimant is disabled. 20 C.F.R. §§ 404.1520(a)-(f), 416.920(a)-(f) (1998).[1] The Commissioner sequentially determines the following: (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant suffers from a severe impairment; (3) whether the impairment meets or is medically equivalent to an impairment in the Commissioner's Listing of Impairments; (4) whether the claimant is capable of performing work which the claimant performed in the past; and (5) whether the claimant is capable of performing any other work in the national economy.

At Step One, the Commissioner determines whether the claimant is currently engaged in

---

[1]The Commissioner has promulgated parallel regulations governing disability determinations under Title II and Title XVI. See 20 C.F.R. Ch. III, Parts 404, 416. For syntactic simplicity, future references to Part 416 of the regulations will be omitted where they are identical to Part 404.

9

substantial gainful activity. 20 C.F.R. § 404.1520 (a),(b). Substantial gainful activity is work that involves doing significant and productive physical or mental duties that are done, or intended to be done, for pay or profit. 20 C.F.R. § 404.1510. If the claimant is engaged in substantial gainful activity, he is found not disabled, regardless of medical condition, age, education, or work experience, and the inquiry ends; if not, the inquiry proceeds to Step Two.

Step Two requires a determination whether the claimant is suffering from a severe impairment.[2] A severe impairment is one which significantly limits the claimant's physical or mental ability to do basic work activities. 20 C.F.R. § 404.1520(c). The claimant's age, education, and work experience are not considered in making a Step Two severity determination. 20 C.F.R. § 404.1520(c). If the claimant suffers from severe impairment, then the inquiry moves on to Step Three; if not, then the claimant is found to be not disabled, and the inquiry ends.

At Step Three, the claimant's impairment is compared to those listed in 20 C.F.R. Ch. III, Part 404, Subpart P, Appendix 1. The listings describe, for each of the major body systems, impairments which are considered severe enough *per se* to prevent a person from doing any significant gainful activity. 20 C.F.R. §§ 404.1525(a). The listings streamline the decision process by identifying certain disabled claimants without need to continue the inquiry. *Bowen v. New York*, 476 U.S. 467 (1986). Accordingly, if the claimant's impairment meets or is medically equivalent to one in the listings, then the claimant is found to be disabled, and the inquiry ends; if not, the inquiry moves on to Step Four.

---

[2]The claimant need not specify a single disabling impairment, as the Commissioner will consider the combined affect of multiple impairments. See, e.g., 20 C.F.R. § 404.1520(c). For syntactic simplicity, however, this generic discussion of the Commissioner's decision-making process will use the singular "impairment" to include both singular and multiple impairments.

At Step Four, the Commissioner determines whether the claimant's residual functional capacity allows the claimant to return to past relevant work. Residual functional capacity is a measure of the abilities which the claimant retains despite his impairment. 20 C.F.R. § 404.1545(a). Although medical opinions bear strongly upon the determination of residual functional capacity, they are not conclusive; the determination is left to the Commissioner, who must resolve any discrepancies in the evidence and base a decision upon the record as a whole. 20 C.F.R. § 404.1527(e)(2); *Diaz v. Chater*, 55 F.3d 300, 306 n.2 (7th Cir. 1995). Past relevant work is work previously performed by the claimant that constituted substantial gainful activity and satisfied certain durational and recency requirements. 20 C.F.R. § 404.1565; Social Security Ruling 82-62. If the claimant's residual functional capacity allows him to return to past relevant work, then he is found not disabled; if he is not so able, the inquiry proceeds to Step Five.

At Step Five, the Commissioner must establish that the claimant's residual functional capacity allows the claimant to engage in work found in significant numbers in the national economy. 20 C.F.R. §§ 404.1520(f), 404.1566. The Commissioner may carry this burden by relying upon vocational expert testimony, or by showing that a claimant's residual functional capacity, age, education, and work experience coincide exactly with a rule in the Medical-Vocational Guidelines (the "grids"). *See* 20 C.F.R. Ch. III, Part 404 Subpart P, Appendix 2; *Walker v. Bowen*, 834 F.2d 635, 640 (7th Cir. 1987); Social Security Law and Practice, Volume 3, § 43:1. If the ALJ correctly relies on the grids, vocational expert evidence is unnecessary. *Luna v. Shalala*, 22 F.3d 687, 691-92 (7th Cir. 1994). If the Commissioner establishes that sufficient work exists in the national economy that the claimant is qualified and able to perform, then the claimant will be found not disabled; if not, the claimant will be found to be disabled.

## VI. ANALYSIS

The court will proceed through the five step analysis in order.

A. Step One: Is the claimant currently engaged in substantial gainful activity?

In performing the Step One Analysis, the ALJ found that Plaintiff "has likely engaged in substantial gainful activity since the alleged onset of disability, but the issue need not be resolved as there exist other valid reasons for denial of the claim." (Tr. 20).

Under ordinary circumstances, a claimant is engaged in substantial gainful activity if the claimant's earnings averaged more than seven hundred and eighty dollars per month for years after January 1, 2001. (20 C.F.R § 1574 (b) (2) Table 1, as modified by 65 FR 82905, December 29, 2000).

The finding of the ALJ as to Step One of the Analysis is not challenged by either party and this Court finds no reason to disturb this finding. However, this Court finds that the ALJ may reevaluate the onset date of Plaintiff's disability upon remand.

B. Step Two: Does the claimant suffer from a severe impairment?

In performing the Step Two Analysis the ALJ found Plaintiff suffered from severe impairments. Specifically, the ALJ found that Plaintiff suffers from status post right tibial fracture and degenerative disease of the right great toe. (Tr. 15).

Substantial evidence exists to support the ALJ's determination that Plaintiff suffers from severe impairments. This finding is not challenged by either party and the court finds no reason to disturb it. The ALJ's finding as to Step Two of the Analysis is affirmed.

C. Step Three: Does claimant's impairment meet or medically equal an impairment in the Commissioner's listing of impairments?

In performing the analysis for Step Three the ALJ determined that Plaintiff's impairments do not meet or equal any impairment in Appendix 1 to Subpart P of Regulations number 4. (Tr. 20). The ALJ found that while Plaintiff's impairments are severe within the meaning of the Regulations, they are not severe enough to meet or medically equal one of the impairments listed in the regulation.

Substantial evidence exists to support the ALJ's finding and this Court finds no reason to disturb it. Therefore, the ALJ's determination as to Step Three of the Analysis is affirmed.

D. Step Four: Is the claimant capable of performing work which the claimant performed in the past?

In performing the analysis for Step Four, the ALJ determined that Plaintiff is unable to perform any of his past relevant work. The finding of the ALJ as to Step Four of the Analysis is not challenged by either party and this Court finds no reason to disturb this finding. The ALJ's determination as to Step Four of the Analysis is affirmed. (Tr. 18).

E. Step Five: Is the claimant capable of performing any work existing in substantial numbers in the national economy?

At Step Five, the ALJ determined that Plaintiff's Residual Functional Capacity ("RFC") did not allow him to perform the full range of light work, however the ALJ found that there exist a significant number of jobs in the national economy that Plaintiff can perform. Both parties agree that Plaintiff could do a sit down job. The Medical- Vocational Guidelines require further analysis because of Plaintiff's age, education, and work experience.

In reaching the determination of "not disabled," the ALJ considered Plaintiff's RFC, age, education, and work experience. (Tr. 19). Plaintiff's age, education, and vocationally relevant past work experience were viewed in conjunction with the Medical-Vocational Guidelines of Appendix

13

2 of Subpart P of the Regulations, which contain a series of rules that may direct a conclusion of either "disabled" or "not disabled" depending on the claimant's RFC and vocational profile.

The ALJ found that Plaintiff had the following RFC:

"he is able to lift/carry up to twenty pounds occasionally and ten pounds frequently; he may stand/walk for up to a combined total of two hours in an eight-hour day and for no longer than fifteen to twenty minutes continuously; he may sit with normal breaks for up to six hours in an eight hour day; and while he may not climb ladders, ropes, and scaffolds, he may otherwise climb ramps or stairs, balance, stoop, kneel, crouch, and crawl no more than occasionally." (Tr. 20).

The ALJ determined that Plaintiff was not disabled under the Medical-Vocational Guidelines. (Tr. 19). Because he was 54 years old at the time of the hearing, under the guidelines Plaintiff was defined as an individual closely approaching advanced age. (*Id.*) Plaintiff also had the equivalence of a high school education. (*Id.*). According to the Medical-Vocational Guidelines, an individual of Plaintiff's age and education, with a similar RFC, is not determined disabled if he has some transferable skills.[3] Because the testimony of the Mr. Yep, the vocational expert, indicated that Plaintiff did have transferable skills, the ALJ found that Plaintiff was not disabled. (*Id.*). Specifically, Mr. Yep testified that Plaintiff's transferable skills arose out of his work as an equipment operator, and that he could continue performing at a lighter level of exertion. (*Id.*).

Plaintiff argues that he does not have transferable skills, but that Mr. Yep's designation of "familiarity and operation of equipment" relate to traits instead of skills. (Pl.'s Br. at 4). Although the regulation does not go into detail as to what defines a "skill," the Social Security Ruling (SSR)

---

[3]"Transferability of skills for individuals of advanced age. If you are of advanced age (age 55 or older), and you have a severe impairment(s) that limits you to sedentary or light work, we will find that you cannot make an adjustment to other work unless you have skills that you can transfer to other skilled or semiskilled work (or you have recently completed education which provides for direct entry into skilled work) that you can do despite your impairment(s)." 20 CFR § 404.1568(d)(4)

14

82-41 provides a more precise definition of a skill. It states,

> a skill is knowledge of a work activity which requires the exercise of significant judgment that goes beyond the carrying out of simple job duties and is acquired through performance of an occupation which is above the unskilled level (requires more than 30 days to learn). It is practical and familiar knowledge of principles and processes of an art, science or trade, combined with the ability to apply them in practice in a proper and approved manner. This includes activities like making precise measurements, reading blueprints, and setting up and operating complex machinery. A skill gives a person a special advantage over unskilled workers in the labor market.

SSR 82-41(2)(a). According to this definition, the setting up and operation of complex machinery is considered a skill. In his work history report, Plaintiff reported that he had performed the equipment operator job at a medium exertional level for over four years. (Tr 151). When referring to the transferability of Plaintiff's work experience as an equipment operator, Mr. Yep did not rely on traits such as "coordination" or "alertness." Instead, Mr. Yep testified that Plaintiff's extensive prior work experience as an equipment operator gave him familiarity and knowledge regarding the operation of the equipment which amounted to a skill. (Tr. 67). This Court finds that Mr. Yep's testimony was consistent with the definition of a skill provided by the Social Security Administration.

Plaintiff also argues that his experience in operating machinery is not transferable because there is a lack of similarity between Plaintiff's previous work and those which exist in substantial numbers in the national economy. (Pl.'s Br. at 10). The regulation provides,

> transferability is most probable and meaningful among jobs in which 1) the same or a lesser degree of skill is required; 2) the same or similar tools and machines are used; and 3) the same or similar raw materials, products, processes, or services are involved.

20 CFR § 404.1568 (d)(2). Essentially, the regulation designates a skill as transferable for an individual of advancing age where there is little adjustment. This Court finds that Mr. Yep was

15

vague in his description of the work to which Plaintiff's skills would be transferred. Without more specific information regarding the work that Plaintiff would be expected to do, this Court cannot determine whether Plaintiff would need little adjustment to perform the jobs available to him.

Mr. Yep testified that Plaintiff's skills were readily transferable to approximately 6,852 jobs existing in the regional economy at the light level of exertion. (Tr. 21). These jobs are primarily sitting, but are classified as light due to the need to operate foot pedals. Mr. Yep testified that these jobs would require essentially no adjustment of skills for the Plaintiff. (*Id.*). When asked about the particular type of work to which Plaintiff's skill would transfer, Mr Yep simply stated, " it would fall under the range of equipment operators...operating basically the same equipment." (Tr. 69). This Court is unclear as to what type of work is available for Plaintiff in the regional economy. Thus, this Court finds it difficult to determine the level of adjustment for Plaintiff. The development of this information is necessary for the ALJ to develop a clear path of reasoning for the court to follow. *See Lopez ex rel. Lopez v. Barnhart*, No. 02-2646, 2003 WL 21540425, at *3 (7th Cir. July 9, 2003)("When an ALJ denies benefits, he must build an 'accurate and logical bridge from the evidence to his conclusion,' ... .")(quoting *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000)).

This Court is also deeply concerned with Mr. Yep's testimony regarding Plaintiff's ability to work at the light exertional level as an equipment operator. At the November 2000 hearing, Mr. Yep testified that the use of a cane for ambulation may impact a person's capacity to perform as an equipment operator even at a light level. The transcript reads:

> Q: Okay. All right. If I were to add to that the occasional use of a cane for ambulation, would that impact in any way upon capacity to perform those light jobs as equipment operator?
> A: I would say it will, and not so much the use of the cane, but the use of the cane implies that the person has a weakness or a problem with their leg. In order to

16

operate the equipment, they're going to need to have to operate foot pedals.
Q: Okay. Okay. All right. So that would essentially eliminate it?
A: Yes, it would.

(Tr. 71). The testimony suggests that Plaintiff would be unable to perform as an equipment operator because he could not operate foot petals on the equipment. Defendant argues that the ALJ was not required to give this testimony any weight because it was outside of Mr. Yep's area of expertise. (Def.'s Br. at 7). However, this Court finds that Mr. Yep's testimony regarding Plaintiff's ability to perform as an equipment operator at a light level seriously reflects Plaintiff's physical capacity to do work. Should Plaintiff be found unable to operate certain equipment, he would be unable to perform work as an equipment operator even at a light level of exertion.

This Court is unclear as to what Plaintiff would be required to do. The testimony indicates that he would be responsible for operating the pedals on certain equipment. According to Plaintiff's testimony at the November 2000 hearing, he limits his driving because of his physical limitations. (Tr. 74). The transcript reads,

> Q: Okay. How long are you able to sustain the act of driving?
> A: That's a hard question to answer because if we go anywhere where we're going to be in the car an hour, I have my wife drive. Just because I change positions several times, and you can't change much when you are driving.
> Q: Okay
> A: I haven't driven any lengthy, I haven't driven an hour at a time in quite a while because of that.

(*Id.*). This suggests that Plaintiff would have a great deal of difficulty performing as an equipment operator. Plaintiff also testified at the hearing that he previously experienced problems getting in and out of the equipment when he last worked as an equipment operator. (Tr. 74, 75). Without the ability to mount the equipment, remain seated for an extended period of time, and operate the pedals, Plaintiff would be unable to perform work as an equipment operator. If he cannot perform the work,

17

he has no transferable skill and should be found disabled.

This Court finds that the ALJ failed to develop a clear path of reasoning for the court to follow; therefore, the case must be remanded for further clarification of available jobs, and greater consideration of Plaintiff's limitations.

## VII. CONCLUSION

For the above stated reasons, Plaintiff's Motion for Summary Judgment is granted. The case is remanded for clarification of Plaintiff's job availability and consideration of Plaintiff's ability to perform that type of work. It is further ordered that Defendant's Motion for Summary Judgment is denied.

**ENTER:**

*P. Michael Mahoney*
P. MICHAEL MAHONEY, MAGISTRATE JUDGE
UNITED STATES DISTRICT COURT

DATE: 7/23/03